UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS | | |
| ANTITRUST LITIGATION | : | Master File No. 12-md-02311 |
| | : | H: 12-cv-00403 |
| PRODUCT(S): | : | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| HEATING CONTROL PANELS | : | |
| | : | |
| This Document Relates to: | : | JURY TRIAL DEMANDED |
| | : | **[FILED UNDER SEAL – HIGHLY CONFIDENTIAL]** |
| ALL END-PAYOR ACTIONS | : | |
| | : | |

**TABLE OF CONTENTS**

**Page(s)**

I.    NATURE OF ACTION ................................................................................1

II.   JURISDICTION AND VENUE ..................................................................4

III.  PARTIES ....................................................................................................7

      A.    PLAINTIFFS ....................................................................................7

      B.    DENSO DEFENDANTS ................................................................11

      C.    SUMITOMO DEFENDANTS.........................................................12

      D.    TOKAI RIKA DEFENDANTS ......................................................14

      E.    ALPS DEFENDANTS....................................................................15

IV.   AGENTS AND CO-CONSPIRATORS .....................................................16

V.    FACTUAL ALLEGATIONS .....................................................................17

      A.    THE HCP INDUSTRY...................................................................17

      B.    THE DEFENDANTS AND THEIR CO-CONSPIRATORS INCREASED
            PRICES FOR HCPS DESPITE STEADY COSTS...............................19

      C.    THE STRUCTURE AND CHARACTERISTICS OF THE HCP MARKET
            RENDER THE CONSPIRACY MORE PLAUSIBLE .........................20

            1.    The HCP Market Has High Barriers to Entry...........................20

            2.    There is Inelasticity of Demand for HCPs................................21

            3.    The Market for HCPs Is Highly Concentrated .........................22

            4.    Defendants had Ample Opportunities to Conspire ....................22

      D.    GOVERNMENT INVESTIGATIONS .............................................22

      E.    DENSO PLEADS GUILTY TO PRICE-FIXING HEATING CONTROL
            PANELS ........................................................................................24

F.     TOKAI RIKA PLEADS GUILTY TO PRICE-FIXING HEATING CONTROL PANELS AND DESTROYING RELEVANT EVIDENCE ............26

G.     THE LIKELY EXISTENCE OF A COOPERATING DEFENDANT ................28

H.     ADDITIONAL GUILTY PLEAS IN RELATED MARKETS IN THE AUTOMOTIVE INDUSTRY ................................................................28

I.     ILLUSTRATIVE EXAMPLES OF DEFENDANTS' CONSPIRATORIAL CONDUCT ........................................................32

VI.     CLASS ACTION ALLEGATIONS ................................................34

VII.     PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY ....................37

VIII.     PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS ........................................................................43

A.     THE STATUTE OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE PLAINTIFFS DID NOT AND COULD NOT DISCOVER THEIR CLAIMS ........................................................43

B.     FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS ........................................................44

IX.     CLAIMS FOR RELIEF ................................................................46

FIRST CLAIM FOR RELIEF
Violation Of Section 1 Of The Sherman Act  (On Behalf Of Plaintiffs and
The Nationwide Class) ................................................................46

SECOND CLAIM FOR RELIEF
Violation of State Antitrust Statues (On Behalf Of Plaintiffs and The Damages Class)...............48

THIRD CLAIM FOR RELIEF
Violation Of State Consumer Protection Statutes (On Behalf Of Plaintiffs and
The Damages Class) ................................................................68

FOURTH CLAIM FOR RELIEF
Unjust Enrichment
(On Behalf Of Plaintiffs and The Damages Class)........................................85

PRAYER FOR RELIEF ................................................................86

JURY DEMAND ................................................................91

Plaintiffs Tom Halverson, Stephanie Petras, Melissa Barron, John Hollingsworth, Ifeoma Adams, Meetesh Shah, Michael Tracy, Jane Taylor, Jennifer Chase, Darrel Senior, James Marean, Ron Blau, Roger Olson, Susan Olson, Nilsa Mercado, Darcy Sherman, Curtis Gunnerson, David Bernstein, Ellis Winton McInnis, Thomas Wilson, Lauren Primos, Robert Klinger, Jessica DeCastro, Virginia Pueringer, Nathan Croom, Richard Stoehr, Edward Muscara, Michael Wick**,** Ian Groves, Tenisha Burgos, Jason Grala, Kathleen Tawney, Melinda Harr, Cindy Prince, Paul Gustafson, France Gammell-Roach, William Dale Picotte, Jesse Powell, Alena Farrell, Janne Rice, Robert Rice, Stacey Nickell, Carol Ann Kashishian, Susan LaCava, Kelly Klosterman, Sophie O'Keefe-Zelman, Keith Uehara, and Phillip Young (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes", as defined below), upon personal knowledge as to the facts pertaining to them and upon information and belief as to all other matters, based on the investigation of counsel, bring this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, demand a trial by jury, and allege as follows:

**I.    NATURE OF ACTION**

1.     This lawsuit is brought as a proposed class action against the following corporate families: DENSO, Sumitomo, Tokai Rika, and the Alps Defendants (collectively, "Defendants"), defined below, for engaging in a nearly decade-long conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market of Heating Control Panels ("HCPs").  According to the United States Department of Justice ("DOJ"), Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and consumers alike.

1

2.     Plaintiffs represent consumers who purchased or leased new motor vehicles containing HCPs or replacement HCPs for their motor vehicles during the period from and including January 1, 2000 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class Period").

3.     HCPs are located in the center console, back seat, or rear cabin of an automobile and control the temperature of the interior environment of a vehicle.  HCPs are either mechanical or electrical.  Electrical HCPs are either manual (referred to as low-grade) or automatic (referred to as high-grade); HCPs may also be referred to as mid-grade or super-high grade.

4.     Defendants manufacture, market, and sell HCPs throughout and into the United States.  Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to fix, raise, maintain and/or stabilize prices, and allocate market shares for HCPs.

5.     Competition authorities in the United States, the European Union, and Japan have been investigating a conspiracy involving automotive parts since at least February 2010.  As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the markets for a number of different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the industry.  The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several of these competitors.

**DENSO Pleads Guilty to Price-Fixing HCPs**

6.     As more fully alleged herein, Defendant DENSO Corporation ("DENSO") has pleaded guilty to participating in a conspiracy to fix prices, rig bids and allocate the market for

2

HCPs from at least as early as January 2000 and continuing until at least February 2010, and has agreed to pay a $78 million criminal fine related to its unlawful participation in the price-fixing and bid-rigging conspiracies.  DENSO, its high-level personnel and their co-conspirators, participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for HCPs.  Defendant DENSO (a) participated in meetings with competitors where agreements were reached to allocate the supply of HCPs on a model-by-model basis, (b) rigged bids quoted to automobile manufacturers, and (c) agreed with competitors to fix, stabilize and maintain prices, including price adjustments requested by manufacturers.  The combination and conspiracy engaged in by DENSO and their co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

7.     As part of its plea agreement, DENSO agreed, on behalf of itself and its wholly-owned or majority controlled subsidiaries, to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.  The ongoing criminal investigation launched by the United States DOJ into the auto parts industry has already resulted in more than $800 million in criminal fines.

**Tokai Rika Pleads Guilty to Price-Fixing HCPs**

8.     As more fully alleged herein, Defendant Tokai Rika Co., Ltd.("Tokai Rika") has pleaded guilty to participating in a conspiracy to fix prices and rig bids of HCPs from at least as early as September 2003 and continuing until at least February 2010, and has agreed to pay a $17.7 million criminal fine related to its unlawful participation in the price-fixing and bid-rigging conspiracies involving HCPs.  Tokai Rika, its high-level personnel and their co-

conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to fix, raise, maintain, and/or stabilize prices, rig bids, and allocate the market and customers in the United States for HCPs.  Defendant Tokai Rika (a) participated in meetings with competitors where agreements were reached to allocate the supply of HCPs on a model-by-model basis, (b) rigged bids quoted to automobile manufacturers, and (c) agreed with competitors to fix, stabilize and maintain prices, including price adjustments requested by manufacturers.  Defendant Tokai Rika also pleaded guilty to one of its executives, acting on its behalf, destroying evidence relevant to the DOJ's investigation, including electronic data and paper documents "likely to contain evidence of antitrust crimes." Some of the destroyed data is "non-recoverable."  The combination and conspiracy engaged in by Tokai Rika and their co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

9.     As part of its plea agreement, Tokai Rika agreed, on its own behalf and on behalf of its subsidiaries, to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.  As set forth above, the continuing criminal investigation by the DOJ has already resulted in more than $800 million in criminal fines.

10.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for HCPs during the Class Period and have thereby suffered antitrust injury to their business or property.

## II.     JURISDICTION AND VENUE

11.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against the Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages

pursuant to state antitrust, unfair competition, consumer protection and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violation of those state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from at least one of the Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

13.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

14.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its subsidiaries, *inter alia*:  (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of HCPs throughout the United States,

5

including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district. The Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States.

15.     The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States.

16.     The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. The Defendants' products are sold in the flow of interstate commerce.

17.     HCPs manufactured abroad by the Defendants and sold for use in automobiles in the United States are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any HCPs are purchased in the United States, and such HCPs do not constitute import commerce, the Defendants' activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury in the United States.

18.     By reason of the unlawful activities hereinafter alleged, the Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury

6

to Plaintiffs and members of the Classes.  The Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for HCPs, which conspiracy unreasonably restrained trade and adversely affected the market for HCPs.

19.     The Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased HCPs for personal use, including Plaintiffs and members of the Classes.

### III.     PARTIES

**A.     Plaintiffs**

20.      Plaintiff Tom Halverson is an Arizona resident who purchased a HCP indirectly from one or more Defendants.

21.     Plaintiff Stephanie Petras is an Arizona resident who purchased a HCP indirectly from one or more Defendants.

22.     Plaintiff Sophie O'Keefe-Zelman is an Arizona resident who purchased a HCP indirectly from one or more Defendants.

23.     Plaintiff Melissa Barron is a California resident who purchased a HCP indirectly from one or more Defendants.

24.     Plaintiff John Hollingsworth is a California resident who purchased a HCP indirectly from one or more Defendants.

25.     Plaintiff Ifeoma Adams is a California resident who purchased a HCP indirectly from one or more Defendants.

26.     Plaintiff Meetesh Shah is a California resident who purchased a HCP indirectly from one or more Defendants.

27      Plaintiff Michael Tracy is a Florida resident who purchased a HCP indirectly from one or more Defendants.

28      Plaintiff Keith Uehara is a Hawaii resident who purchased a HCP indirectly from one or more Defendants.

29.      Plaintiff Jane M. Taylor is a Hawaii resident who purchased a HCP indirectly from one or more Defendants.

30.      Plaintiff Jennifer Chase is an Iowa resident who purchased a HCP indirectly from one or more Defendants.

31.      Plaintiff Darrel Senior is a Kansas resident who purchased a HCP indirectly from one or more Defendants.

32.      Plaintiff James Marean is a Maine resident who purchased a HCP indirectly from one or more Defendants.

33.      Plaintiff Ron Blau is a Massachusetts resident who purchased a HCP indirectly from one or more Defendants.

34.      Plaintiff Roger Olson is a Michigan resident who purchased a HCP indirectly from one or more Defendants.

35.      Plaintiff Susan Olson is a Michigan resident who purchased a HCP indirectly from one or more Defendants.

36.      Plaintiff Nilsa Mercado is a Michigan resident who purchased a HCP indirectly from one or more Defendants.

37.      Plaintiff Darcy Sherman is a Minnesota resident who purchased a HCP indirectly from one or more Defendants.

38.     Plaintiff Curtis Gunnerson is a Minnesota resident who purchased a HCP indirectly from one or more Defendants.

39.     Plaintiff David Bernstein is a Minnesota resident who purchased a HCP indirectly from one or more Defendants.

40.     Plaintiff Ellis Winton McInnis, IV is a Mississippi resident who purchased a HCP indirectly from one or more Defendants.

41.     Plaintiff Thomas Wilson is a Mississippi resident who purchased a HCP indirectly from one or more Defendants.

42.     Plaintiff Lauren Primos is a Mississippi resident who purchased a HCP indirectly from one or more Defendants.

43.     Plaintiff Robert Klinger is a Missouri resident who purchased a HCP indirectly from one or more Defendants.

44.     Plaintiff Jessica DeCastro is a Missouri resident who purchased a HCP indirectly from one or more Defendants.

45.     Plaintiff Virginia Pueringer is a Montana resident who purchased a HCP indirectly from one or more Defendants.

46.     Plaintiff Nathan Croom is a Nebraska resident who purchased a HCP indirectly from one or more Defendants.

47.     Plaintiff Richard Stoehr is a Nevada resident who purchased a HCP indirectly from one or more Defendants.

48.     Plaintiff Edward Muscara is a New Hampshire resident who purchased a HCP indirectly from one or more Defendants.

49.     Plaintiff Michael Wick is a New Mexico resident who purchased a HCP indirectly from one or more Defendants.

50.     Plaintiff Ian Groves is a New Mexico resident who purchased a HCP indirectly from one or more Defendants.

51.     Plaintiff Tenisha Burgos is a New York resident who purchased a HCP indirectly from one or more Defendants.

52.     Plaintiff Jason Grala is a New York resident who purchased a HCP indirectly from one or more Defendants.

53.     Plaintiff Kathleen Tawney is a North Carolina resident who purchased a HCP indirectly from one or more Defendants.

54.     Plaintiff Melinda Harr is a North Dakota resident who purchased a HCP indirectly from one or more Defendants.

55.     Plaintiff Kelly Klosterman is a North Dakota resident who purchased a HCP indirectly from one or more Defendants.

56.     Plaintiff Cindy Prince is an Oregon resident who purchased a HCP indirectly from one or more Defendants.

57.     Plaintiff Paul Gustafson is an Oregon resident who purchased a HCP indirectly from one or more Defendants.

58.     Plaintiff France Gammell-Roach is a Rhode Island resident who purchased a HCP indirectly from one or more Defendants.

59.     Plaintiff William Dale Picotte is a South Dakota resident who purchased a HCP indirectly from one or more Defendants.

60.     Plaintiff Phillip Young is a Tennessee resident who purchased a HCP indirectly from one or more Defendants.

61.     Plaintiff Jesse Powell is a Utah resident who purchased a HCP indirectly from one or more Defendants.

62.     Plaintiff Alena Farrell is a Vermont resident who purchased a HCP indirectly from one or more Defendants.

63.     Plaintiff Janne Rice is a West Virginia resident who purchased a HCP indirectly from one or more Defendants.

64.     Plaintiff Robert Rice is a West Virginia resident who purchased a HCP indirectly from one or more Defendants.

65.     Plaintiff Stacey Nickell is a West Virginia resident who purchased a HCP indirectly from one or more Defendants.

66.     Plaintiff Carol Ann Kashishian is a Wisconsin resident who purchased a HCP indirectly from one or more Defendants.

67.     Plaintiff Susan LaCava is a Wisconsin resident who purchased a HCP indirectly from one or more Defendants.

**B.     DENSO Defendants**

68.     Defendant DENSO Corporation is a Japanese corporation with its principal place of business in Kariya, Japan.  Defendant DENSO Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.

11

69.     Defendant DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation.  A number of Denso America's executives also work or have worked for Denso Corporation.  Kazumasa Kimura, the COO of Denso America, serves as one of Denso Corporation's executive directors.  Kimura is also the former director of the Global Sales and Business Development Division of Denso Corporation.  Similarly, Hikaru "Howard" Sugi, the President and CEO of Denso America, is the senior executive director of Denso Corporation.  Defendant DENSO International America, Inc. manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

70.     DENSO Corporation and DENSO International America, Inc. are herein referred to and shall be referred to together herein as the "DENSO Defendants" or "DENSO."

**C.     Sumitomo Defendants**

71.     Defendant Sumitomo Electric Industries, Ltd. is a Japanese corporation with its principal place of business in Osaka, Japan.  Defendant Sumitomo Electric Industries, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.

72.     Defendant Sumitomo Electric Wintec America, Inc. is a Kentucky corporation with its principal place of business in Edmonton, Kentucky.  It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric Industries, Ltd.  Defendant Sumitomo

Electric Wintec America, Inc. manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

73.     Defendant Sumitomo Wiring Systems, Ltd. is a Japanese corporation. Defendant Sumitomo Wiring Systems, Ltd.  – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

74.     Defendant Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Bowling Green, Kentucky.  It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.  Defendant Sumitomo Electric Wiring Systems, Inc. manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

75.     Defendant K&S Wiring Systems, Inc. is a Delaware corporation with its principal place of business in La Vergne, Tennessee. It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric Industries, Ltd.  Defendant K&S Wiring Systems, Inc. manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class

Period, its activities in the United States were under the control and direction of its Japanese parent.

76.     Defendant Sumitomo Wiring Systems (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan.  It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.  Defendant Sumitomo Wiring Systems (U.S.A.) Inc. manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

77.     Executives who have worked for Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd., in Japan, have also worked for Sumitomo Electric Wiring Systems, Inc. in the U.S.   For instance, Hideyuki Shigi, Senior Executive Officer of Sumitomo Wiring Systems, Ltd., and former Managing Executive Officer of Sumitomo Electric Industries, Ltd., is also the President of Sumitomo Electric Wiring Systems, Inc.  Defendants Sumitomo Electric Industries, Ltd., Sumitomo Electric Wintec America, Inc., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc. and Sumitomo Wiring Systems (U.S.A.) Inc. shall collectively be referred to herein as the "Sumitomo Defendants" or "Sumitomo."

**D.     Tokai Rika Defendants**

78.      Defendant Tokai Rika, Co. Ltd. is a Japanese company with its principal place of business in Toyota, Japan.  Defendant Tokai Rika, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold

HCPs that were purchased throughout the United States, including in this district, during the Class Period.

79.     Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. is a Michigan corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent Tokai Rika, Co. Ltd.  Executives who have worked at Tokai Rika Co. Ltd. have also worked at TRAM, Inc.  For instance, Masayuki Morita, the President and Chief Operating Officer at TRAM, Inc. previously served as a Managing Director and Director at Tokai Rika Co., Ltd.  During the Class Period, Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

80.     Tokai Rika, Ltd. and TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. are herein referred collectively as the "Tokai Rika Defendants" or "Tokai Rika."

**E.     Alps Defendants**

81.     Defendant Alps Electric Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Defendant Alps Electric Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.

82.     Defendant Alps Electric (North America), Inc. is a California corporation with its principal place of business in Campbell, California.  It is a subsidiary of and wholly owned and/or controlled by its parent, Alps Electric Co., Ltd.  Defendant Alps Electric (North

America), Inc. manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

83.     Defendant Alps Automotive Inc. is a Michigan corporation with its principal place of business in Auburn Hills, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Alps Electric Co., Ltd.  Defendant Alps Automotive Inc. manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

84.     Executives who have worked for Alps Electric Co. Ltd. in Japan have also worked for Alps Electric North America, Inc. and Alps Automotive, Inc., in the U.S.  For instance, Yasuhiro Fujii, an Executive Director of Alps Electric Co. Ltd., has previously served as Chairman of Alps Electric North America, Inc. and Alps Automotive, Inc.  Defendant Alps Electric Co., Ltd., Defendant Alps Electric (North America), Inc., and Defendant Alps Automotive Inc. are herein referred to and shall be referred to together herein as the "Alps Defendants" or "Alps."

## IV.     AGENTS AND CO-CONSPIRATORS

85.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged.

86.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses

alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

87.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## V.    FACTUAL ALLEGATIONS

### A.    The HCP Industry

88.     HCPs are located in the center console of an automobile and incorporate switches that control the temperature of the interior environment of a vehicle.  *See* Figures 1 and 2.



Figure 1.



(1) Heater and A/C Control Assembly
(2) Instrument Panel

Figure 2.

89.     HCPs are installed by automobile original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process. They are also installed to replace worn out, defective or damaged HCPs.

90.     When purchasing HCPs, OEMs issue Requests for Quotations ("RFQs") to automotive parts suppliers on a model-by-model basis for model-specific parts.  Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEM usually awards the business to the selected automotive parts supplier for four to six years.  Typically, the bidding process begins approximately three years prior to the start of production of a new model.  Japanese OEMs procure parts for U.S.-manufactured vehicles both in Japan and the United States.

91.     The Defendants and their co-conspirators supplied HCPs to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere.  The Defendants and their co-conspirators manufactured HCPs (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

18

92.     Plaintiffs and members of the proposed Classes purchased HCPs indirectly from the Defendants and/or their co-conspirators.  By way of example, an owner of a vehicle may indirectly purchase a HCP from the Defendants or their co-conspirators as part of purchasing or leasing the new vehicle.  An owner of a vehicle may also indirectly purchase a replacement HCP from Defendants when repairing a damaged vehicle or where the HCP is defective.

93.     Denso's main customers include: Honda, Toyota, General Motors, Mercedes-Benz, BMW, Ford, Chrysler, Subaru, Mazda, Suzuki, Mitsubishi, Nissan, Kia, Hyundai, Volvo, among others.

94.     Sumitomo's main customer is Toyota.

95.     Tokai Rika's main customers include Toyota, Subaru, SAAB, Volvo, Nissan, Subaru, Isuzu, GM, Ford, Suzuki, Mazda, Isuzu Mitsubishi and Chrysler.

96.     Alps' main customers include Honda and General Motors.

97.     Replacement Heater Control Panels sold by OEMs to dealerships are the same as the Heater Control Panels installed in vehicles and are made by the same manufacturer who made the Heater Control Panels originally installed.  Such replacement parts are not the same as aftermarket parts, which are made by different manufacturers than those who manufactured the original parts.  The prices of replacement Heater Control Panels were inflated by Defendants' collusion, either as a direct effect of their conspiracy, or through umbrella effects.

**B.    The Defendants and Their Co-Conspirators Increased Prices for HCPs Despite Steady Costs**

98.     In a competitive market, falling material and labor costs would lead to decreased prices because each competitor would be afraid that other competitors would attempt to take advantage of their lower costs to lower their prices in order to capture market share.  The only economically rational action in such a situation is for each competitor to lower its own prices.

99.     In a market where competitors have engaged in a conspiracy to fix prices, however, competitors do not lower prices even when faced with steady or decreasing input costs.  Such price decreases are unnecessary because the conspirators know that they will not lose sales to lower-priced competitors.

100.     The price of HCPs increased during the Class Period, while major input costs virtually remained the same.  In a competitive market, steady input costs should not have resulted in rising prices for HCPs to Defendants' and their co-conspirators' customers.  Such anticompetitive price increases have resulted in Plaintiffs and members of the Classes paying supra-competitive prices.

## C.     The Structure and Characteristics of the HCP Market Render the Conspiracy More Plausible

101.     The structure and other characteristics of the HCP market in the United States are conducive to a price-fixing and market allocation agreement, and have made collusion particularly attractive in this market.  Specifically, the HCP market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

### 1.     The HCP Market Has High Barriers to Entry

102.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely to enter the market.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

103.     There are substantial barriers that preclude, reduce, or make more difficult entry into the HCP market.  A new entrant into the business would face costly and lengthy start-up

20

costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.  For instance, DENSO owns several patents for the component parts that make up HCPs.  These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

104.    In addition, OEMs cannot change HCP suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the HCP it purchases for a vehicle is then integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model.  Thus, the design must be synergized by HCP manufacturers and OEMs.  It would be difficult for a new market entrant to do so.

### 2.    There is Inelasticity of Demand for HCPs

105.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

106.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

107.    Demand for HCPs is highly inelastic.  Demand for HCPs is inelastic because there are no close substitutes for these products.  In addition, customers must purchase HCPs as an essential part of a vehicle, even if the prices are kept at a supracompetitive level.

**3.    The Market for HCPs Is Highly Concentrated**

108.    A highly concentrated market is more susceptible to collusion and other anti-competitive practices.

109.    The Defendants in this case dominate the HCP market.

**4.    Defendants had Ample Opportunities to Conspire**

110.    Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and performed acts necessary for the operation and furtherance of the conspiracy.  For example, Defendants and their co-conspirators have regularly attended the annual North American International Auto Show ("NAIAS") in Detroit, Michigan and the Automotive Aftermarket Products Expo in Las Vegas, Nevada.  Indeed, according to the NAIAS website, Defendant DENSO was a premier sponsor of the 2012 event, held January 9 to January 22.

**D.    Government Investigations**

111.    A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of automotive parts, including HCPs.

112.    The probe originated in Europe as the result of several European automobile manufacturers coming together to bring a complaint to the European Commission ("EC").  One carmaker is said to have failed to attract competitive bids for HCPs, leading the company to join with other carmakers to take their complaint to the EC.

22

113.    On February 8, 2010, the EC executed surprise raids at the European offices of

certain automotive parts makers as part of an investigation into anti-competitive conduct related

to the manufacturing and sale of automotive parts.  The EC also carried out additional raids at

the European offices of several suppliers of automotive parts on June 7, 2010.  Specifically, EC

investigators raided the offices of Leoni AG, S-Y Systems Technologies Europe GmbH, Yazaki

Corporation and DENSO.  "The Commission has reason to believe that the companies

concerned may have violated European Union antitrust rules that prohibit cartels and restrictive

business practices," an EC official said in a statement.

114.    In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of

DENSO as part of an expansive investigation into collusion in the automotive parts industry

dating back to at least 2000.

115.    The DOJ has stated that it is conducting an investigation of potential antitrust

activity and coordinating its investigation with antitrust regulators in Europe.  "The antitrust

division is investigating the possibility of anticompetitive cartel conduct of automotive

electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

116.    Indeed, on February 23, 2010, around the same time as the raids by the Japanese

and European competition authorities, investigators from the FBI raided three Detroit-area

Japanese auto parts makers as part of a federal antitrust investigation.  The FBI executed

warrants and searched the offices of these companies, including DENSO's subsidiary in

Southfield, Michigan.  Special Agent Sandra Berchtold said the affidavits supporting issuance

of the warrants were sealed in federal court.

117.    To obtain search warrants, the United States was legally required to have

probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust

violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

**E.    DENSO Pleads Guilty to Price-Fixing Heating Control Panels**

118.    On January 30, 2012, the DOJ announced that DENSO had agreed to pay a $78 million fine and plead guilty to a two count criminal information charging DENSO with: (1) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Electronic Control Units sold to certain automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; and (2) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, maintain the prices and allocate the market of HCPs sold to certain automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

119.    According to the criminal information filed against DENSO, DENSO and its co-conspirators carried out the HCP conspiracy by:

(a)     participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of HCPs sold to certain automobile manufacturers in the United States and elsewhere on a model-by-model basis;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile manufacturers in the United States and elsewhere;

(e)     submitting bids, price quotations, and price adjustments to certain automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling HCPs to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for HCPs sold to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)      employing measures to keep their conduct secret, including but not

limited to using code names and meeting at private residences or remote locations.

120.    The plea agreement is an outgrowth of the initial charges in the DOJ's

international cartel investigation of price-fixing and bid rigging in the automotive parts industry.

121.    In addition to the fact that Defendant DENSO pleaded guilty and agreed on its

own behalf and on behalf of its subsidiaries to cooperating in the government's investigation,

several of its high-ranking executives have pled guilty to criminal price-fixing.  For example,

Norihiro Imai pleaded guilty to his role in the conspiracy to fix prices and rig bids for HCPs.

Makato Hattori from DENSO also pleaded guilty to fixing prices and rigging bids for HCPs.

## F.    Tokai Rika Pleads Guilty to Price-Fixing Heating Control Panels and Destroying Relevant Evidence

122.    On December 12, 2013, Defendant Tokai Rika Co., Ltd., pleaded guilty to (1)

participating in a combination and conspiracy with its co-conspirators to suppress and eliminate

competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize,

maintain the prices and allocate the market of HCPs sold to certain automobile manufacturers in

the United States and elsewhere from at least as early as September 2003 and continuing until at

least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; and (2) having an

executive, acting on the company's behalf, knowingly and corruptly persuading employees to

alter, destroy, mutilate and conceal documentary evidence relevant to the DOJ's investigation

into the HCP industry.

123.    According to the criminal information filed against Tokai Rika, it and its co-

conspirators carried out the conspiracy by:

(a)      participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

(b)      agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

(c)      agreeing, during those meetings, conversations, and communications, to allocate the supply of HCPs sold to certain automobile manufacturers in the United States and elsewhere on a model-by-model basis;

(d)      agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile manufacturers in the United States and elsewhere;

(e)      submitting bids, price quotations, and price adjustments to certain automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)      selling HCPs to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)      accepting payment for HCPs sold to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)      engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)      employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

124.    Defendant Tokai Rika pleaded guilty and agreed on its own behalf and on behalf of its subsidiaries to cooperating in the government's ongoing investigation.

## G.    The Likely Existence of a Cooperating Defendant

125.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the Department of Justice. In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

126.    In light of the multiple guilty pleas in this case, in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

## H.    Additional Guilty Pleas in Related Markets in the Automotive Industry

127.    Defendant DENSO, in addition to pleading guilty to fixing the prices of HCPs, has also pleaded guilty to fixing the prices and rigging bids for Electronic Control Units ("ECUs") – an automotive part in a related market.

128.    On January 30, 2012, the DOJ announced that Yazaki Corporation ("Yazaki") had agreed to pay a $470 million fine and plead guilty to a three-count criminal information charging Yazaki with: (1) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing

to rig bids for, and to fix, stabilize, and maintain the prices of, **automotive wire harnesses** and related products sold to certain automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; (2) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, **instrument panel clusters** sold to certain automobile manufacturers in the United States and elsewhere from at least as early as December 2002 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; and (3) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of **fuel senders** sold to certain automobile manufacturers in the United States and elsewhere from at least as early as March 2004 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

129.     In addition to Yazaki, four executives from Yazaki (all Japanese nationals) – Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa, Kazuhiko Kashimoto and Hisamitsu Takada – pleaded guilty to their participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses sold to certain automobile manufacturers in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  These five Yazaki executives will each pay a $20,000 criminal fine and serve prison time ranging from 15 months to two years.  The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

130.    On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. ("Furukawa") had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of automotive wire harnesses to automobile manufacturers.

131.    Three of Furukawa's executives also pleaded guilty to the same conspiracy.  The court sentenced two of the executives to 15 and 18 month prison sentences, to be served in the United States.

132.    A number of additional companies have pleaded guilty to fixing the prices in the automotive wire harness, instrument panel clusters, fuel senders and occupant safety restraint industries.  These companies include: Fujikura, GS Electech, TRW Deutschland Holding GmbH, Autoliv, Inc., and Nippon Seiki Co. Ltd.

133.    The U.S. government has said the case will continue and other suppliers could be charged.

134.    Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division said there is no doubt **consumers** were hurt financially.  "By rigging bids . . . the three companies inflated what some of their auto manufacturing clients paid, and indirectly, what consumers paid for some cars.  Pozen said."  "As a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers," Pozen said.  "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."  Pozen went on to say that there was no doubt that consumers were hurt financially by the cartel's activity.  In a separate press statement, Pozen vowed to continue

30

the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ."

135.    The scheme drove up costs for consumers since the prices were illegally fixed on expensive electrical parts and have risen in cost as cars have become more complex in recent years, Jim Gillette, an analyst with the firm HIS Automotive, said.  Gillette estimated that the price-fixing of wire harnesses alone cost carmakers hundreds of millions of dollars.  Climate control units are even more expensive because they have become more than just dials and switches in recent years.  Even entry-level cars have digital controls that allow drivers and passengers to set their own temperatures.

136.    "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI's Special Agent in Charge Andrew G. Arena.

137.    "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," Arena also said.  "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

138.    On February 15, 2013, Scott Hammond, the deputy assistant attorney general in the antitrust division, discussed DOJ's ongoing automotive parts investigation in a Thomson Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered.  *I say biggest with respect to the __impact__ on*

*U.S. businesses and **consumers**, and the number of companies and executives that are subject to the investigation*."  (emphasis added).

**I.     Illustrative Examples of Defendants' Conspiratorial Conduct**

139. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████
████████████████

140. ███████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

32



141.

142.



143.

144.

## VI. CLASS ACTION ALLEGATIONS

145. Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities that indirectly purchased or leased in the United States, during the Class Period, HCPs, for personal use and not for resale, including the purchase of HCPs as a stand-alone replacement product or as a component of a new motor vehicle purchased or leased from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator.

146. Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant

to the state antitrust, unfair competition, and consumer protection laws on behalf of the

following class (the "Damages Class"):

> All persons and entities that indirectly purchased or leased in the
> Plaintiffs' States, during the Class Period, HCPs, for personal use
> and not for resale, including the purchase of HCPs as a stand-
> alone replacement product or as a component of a new motor
> vehicle purchased or leased from any Defendant or any current or
> former subsidiary or affiliate thereof, or any co-conspirator.

147.    The Nationwide Class and the Damages Class are referred to herein as the

"Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and

affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal

government, states and their subdivisions, agencies and instrumentalities, and persons who

purchased HCPs directly or for resale.

148.    While Plaintiffs do not know the exact number of the members of the Classes,

Plaintiffs believe there are (at least) thousands of members in each Class.

149.    Common questions of law and fact exist as to all members of the Classes.  This

is particularly true given the nature of Defendants' conspiracy, which was generally applicable

to all the members of both Classes, thereby making appropriate relief with respect to the Classes

as a whole.  Such questions of law and fact common to the Classes include, but are not limited

to:

(a)     Whether Defendants and their co-conspirators engaged in a combination

and conspiracy among themselves to fix, raise, maintain or stabilize the prices of HCPs sold in

the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by

Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition law, as alleged in the Second Claim for Relief;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Third Claim for Relief;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of HCPs sold in the United States during the Class Period;

(i)     Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(j)     Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l)     The appropriate class-wide measure of damages for the Damages Class.

150.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they

paid artificially inflated prices for HCPs purchased indirectly from Defendants or their co-conspirators.

151. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

152. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

153. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

154. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**VII. PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY**

155. The Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to HCPs;

(b)     The prices of HCPs have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Indirect purchasers of HCPs have been deprived of free and open competition; and

(d)     Indirect purchasers of HCPs paid artificially inflated prices.

156.    During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for HCPs.  These inflated prices have been passed on to them by OEMs and dealers.   Those overcharges have unjustly enriched Defendants.

157.    The market for HCPs and the market for cars are inextricably linked and intertwined because the market for HCPs exists to serve the vehicle market.  Without the vehicles, the HCPs have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for HCPs.  As stated in the 2010 Annual Report of Lear Corporation, an automobile parts supplier:  "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

158.    HCPs are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, HCPs follow a traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes, and any costs attributable to HCPs can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

159.    Just as HCPs can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of HCPs affect

38

prices paid by indirect purchasers of new motor vehicles containing HCPs and HCP purchased for repair purposes.

160. While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of competition a firm faces. The OEM and dealer markets for new motor vehicles are subject to vigorous price competition. The OEMs and dealers have thin net margins, and are therefore at the mercy of their component costs, such that increases in the price of components such as HCPs lead to corresponding increases in prices for new motor vehicles and replacement parts at the OEM and dealer levels. When downstream distribution markets are highly competitive, as they are in the case of new motor vehicles containing HCPs as components, overcharges are passed through to ultimate consumers, such as the indirect-purchaser plaintiffs and class members.

161. Hence, the inflated prices of HCPs both in new motor vehicles and purchased for repair resulting from Defendants' bid rigging and price-fixing conspiracy have been passed on to Plaintiffs and the other class members by OEMs and dealers.

162. The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

163.    As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

164.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of HCPs and, as a direct and foreseeable result, the price of new motor vehicles containing HCPs and the price of HCPs purchased for repair purposes. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of HCPs on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of HCPs affects changes in the price of new motor vehicles. In such models, the price of HCPs would be treated as an independent or explanatory variable. The model can isolate how changes in the

price of HCPs impact the price of new motor vehicles containing HCPs while controlling for the impact of other price-determining factors.

165.     The precise amount of the overcharge impacting the prices of new motor vehicles containing HCPs can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed-through the chain of distribution.  Thus, the economic harm to Plaintiffs and class members can be quantified.

166.     In addition to the regression analysis discussed above demonstrating impact on consumers, the Department of Justice's Antitrust Division, which has been investigating this cartel for some time, **has concluded that there is "no doubt" that consumers were hurt financially**.  Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division said:  "By rigging bids . . . the three companies inflated what some of their auto manufacturing clients paid, and indirectly, what consumers paid for some cars.  Pozen said."  "As a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers," Pozen said.  "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."  Pozen went on to say that there was no doubt that consumers were hurt financially by the cartel's activity.  In a separate press statement, Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ."

167.     The scheme drove up costs for consumers since the prices were illegally fixed on expensive electrical parts and have risen in cost as cars have come more complex in recent

years, Jim Gillette, an analyst with the firm HIS Automotive, has said.  Gillette estimated that the price-fixing of wire harnesses alone cost carmakers hundreds of millions of dollars.  Climate control units are even more expensive because they have become more than just dials and switches in recent years.   Even entry-level cars have digital controls that allow drivers and passengers to set their own temperatures.

168.    On February 15, 2013, Scott Hammond, the deputy assistant attorney general in the DOJ's Antitrust Division, discussed DOJ's ongoing automotive parts investigation in a Thomson Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered.  *I say biggest with respect to the* **_impact_** *on U.S. businesses and* **_consumers_** *, and the number of companies and executives that are subject to the investigation.*"  (emphasis added).

169.    During Norihiro Imai's plea hearing regarding bid-rigging HPC RFQs, the court stated that "t he of fense  is s erious b y v irtue of  t he a mount of  m oney t hat i s i nvolved i n t he criminal c onduct a dding t o the c ost of ve hicles a nd s ums pa id i nitially b y  the bu yers of  these products the a uto c ompanies that pa id the inflated prices and then pa ssed those inflated pr ices on to the everyone down the chain . . . ."

170.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for HCPs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE
STATUTE OF LIMITATIONS

A.     **The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims**

171.    Plaintiffs repeat and reallege the allegations set forth above.

172.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until shortly before the initial complaint was filed in this multi-district litigation.  Plaintiffs and the members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until January 30, 2012, the date that the DOJ publicly announced DENSO's guilty plea.

173.    Plaintiffs and the members of the Classes are consumers who purchased or leased automobiles or purchased HCPs to replace or repair damaged or defective HCPs in their automobiles. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before the DOJ's January 30, 2012 announcement.

174.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to the DOJ's announcement on January 30, 2012 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to price-fix and rig bids for HCPs.  Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMS or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

175.    For these reasons, the statute of limitations as to Plaintiffs and the Classes'
claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the
members of the Classes have alleged in this Complaint.

**B.      Fraudulent Concealment Tolled the Statute of Limitations**

176.    In the alternative, application of the doctrine of fraudulent concealment tolled the
statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and
the members of the Classes did not know and could not have known of the existence of the
conspiracy and unlawful combination alleged herein until January 30, 2012 at the earliest, the
date that the DOJ announced that Defendant DENSO had agreed to plead guilty for its role in
the criminal price-fixing and bid-rigging conspiracy alleged herein.

177.    Before that time, Plaintiffs and members of the Classes were unaware of
Defendants' unlawful conduct, and did not know before then that that they were paying
supracompetitive prices for HCPs throughout the United States during the Class Period.  No
information, actual or constructive, was ever made available to Plaintiffs and the members of
the Classes that even hinted to Plaintiffs that they were being injured by Defendants' unlawful
conduct.

178.    The affirmative acts of the Defendants alleged herein, including acts in
furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that
precluded detection.

179.    By its very nature, Defendants' anticompetitive conspiracy and unlawful
combinations were inherently self-concealing.  HCPs are not exempt from antitrust regulation
and, thus, Plaintiffs and the members of the Classes reasonably considered it to be a competitive
industry.  Defendants met and communicated in secret and agreed to keep the facts about their

collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.

180.    Plaintiffs and the members of the Classes could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

181.    Throughout the course of the conspiracy, the Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof. Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations. █████████████████████████████

██████   The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs.  DOJ's criminal information, upon which Defendant DENSO's criminal plea agreement was based, charged it with "employing measures to keep their conduct secret, including but not limited to using code words and meeting in private residences or remote locations."  DOJ's criminal information regarding Defendant Tokai Rika similarly charges it with employing code words and meeting at private residences and in remote locations.  The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty in this Court to criminal violations of the Sherman Act.  Defendant Tokai Rika's effort to conceal its conduct and the unlawful conspiracy went so far that it actually engaged in bad-faith destruction of potentially relevant documentary evidence.  Defendant Tokai Rika pleaded guilty to destroying electronic and paper data.  The plea agreement states that "an executive of defendant, acting on the defendant's

behalf, knowingly and corruptly attempted to persuade *and did persuade* employees of the defendant, with intent to cause and induce them to alter, destroy, mutilate, *and conceal* objects with the intent to impair the objects' integrity and availability for use . . . ." (emphasis added). Defendant's executive directed employees to delete electronic data and destroy paper documents likely to contain evidence of antitrust crimes. As the DOJ found, some of the deleted and destroyed documents are non-recoverable.

182. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and the members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until January 30, 2012, at the earliest, the date that the DOJ announced that Defendant DENSO had agreed to plead guilty for its role in the criminal price-fixing and bid-rigging conspiracy alleged herein.

183. For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until January 30, 2012.

## IX. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation Of Section 1 Of The Sherman Act
### (On Behalf Of Plaintiffs And The Nationwide Class)

184. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

185. Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

186. The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents,

employees, or representatives while actively engaged in the management of the Defendants' affairs.

187.    At least as early as January 2000, and continuing until at least February 2010, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize and control prices and rig bids for HCPs, thereby creating anticompetitive effects.

188.    The anti-competitive acts were intentionally directed at the United States market for HCPs and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for HCPs throughout the United States.

189.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for HCPs.

190.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased HCPs have been harmed by being forced to pay inflated, supracompetitive prices for HCPs.

191.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

192.    Defendants' conspiracy had the following effects, among others:

(a)      Price competition in the market for HCPs has been restrained, suppressed, and/or eliminated in the United States;

(b)  Prices for HCPs sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)  Plaintiffs and members of the Nationwide Class who purchased HCPs indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

193.  Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for HCPs purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

194.  The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

195.  Plaintiffs and members of the Nationwide Class are entitled to an injunction against the Defendants, preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF
### Violation Of State Antitrust Statutes
### (On Behalf Of Plaintiffs And The Damages Class)

196.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

197.  During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of HCPs in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

198.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for HCPs and to allocate customers for HCPs in the United States. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price HCPs at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to HCPs sold in the United States;

(b)    allocating customers and markets for HCPs in the United States in furtherance of their agreements; and

(c)    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

199.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to HCPs.

200.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

201.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Arizona; (2) HCP

49

prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

202.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code.  Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, HCPs at supracompetitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of

action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, HCPs.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following:  (1) fixing, raising, stabilizing, and pegging the price of HCPs; and (2) allocating among themselves the production of HCPs.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects:  (1) price competition in the sale of HCPs has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for HCPs sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased HCPs directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for HCPs than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

203.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1)
HCP price competition was restrained, suppressed, and eliminated throughout the District of
Columbia; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels
throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were
deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class
paid supracompetitive, artificially inflated prices for HCPs.

(b)      During the Class Period, Defendants' illegal conduct substantially
affected District of Columbia commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct,
Plaintiffs and members of the Damages Class have been injured in their business and property
and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in
restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*
Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available
under District of Columbia Code Ann. §§ 28-4501, *et seq.*

204.    Defendants have entered into an unlawful agreement in restraint of trade in
violation of the Iowa Code §§ 553.1, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects:  (1)
HCP price competition was restrained, suppressed, and eliminated throughout Iowa; (2) HCP
prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa;
(3) Plaintiffs and members of the Damages Class were deprived of free and open competition;
and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated
prices for HCPs.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

205.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Kansas; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

206.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) HCP price competition was restrained, suppressed, and eliminated throughout Maine; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

207.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

54

(a)      Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Michigan; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

208.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

209.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

56

(d)     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

210.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

211.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Nevada; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

212.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)  During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

213.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

(a)  Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)  During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

59

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

214.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout New York; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs when they purchased vehicles containing HCPs, or purchased products that were otherwise of lower quality, than would have been absent the conspirators illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.*  The conduct set

forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the

Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

215. Defendants have entered into an unlawful agreement in restraint of trade in

violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a) Defendants' combinations or conspiracies had the following effects: (1)

HCP price competition was restrained, suppressed, and eliminated throughout North Carolina;

(2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels

throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of

free and open competition; and (4) Plaintiffs and members of the Damages Class paid

supracompetitive, artificially inflated prices for HCPs.

(b) During the Class Period, Defendants' illegal conduct substantially

affected North Carolina commerce.

(c) As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(d) By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under North Carolina

Gen. Stat. §§ 75-1, *et. seq*.

216. Defendants have entered into an unlawful agreement in restraint of trade in

violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a) Defendants' combinations or conspiracies had the following effects: (1)

HCP price competition was restrained, suppressed, and eliminated throughout North Dakota;

61

(2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

217.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Oregon; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

62

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

218.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

219.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

220.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Utah; (2) HCP

prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah;

(3) Plaintiffs and members of the Damages Class were deprived of free and open competition;

and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially

inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct had a substantial

effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.*  Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Utah Code

Annotated §§ 76-10-911, *et seq.*

221.     Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1)

HCP price competition was restrained, suppressed, and eliminated throughout Vermont; (2)

HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout

Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive,

artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct had a substantial

effect on Vermont commerce.

65

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

222.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq*.

223.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) HCP prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

224.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid more for HCPs than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

225.    In addition, Defendants have profited significantly from the aforesaid conspiracy.   Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of members of the Plaintiffs and the members of the Damages Class.

226.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
### Violation Of State Consumer Protection Statutes
### (On Behalf Of Plaintiffs And The Damages Class)

227.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

228.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

229.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)    During the Class Period, defendants marketed, sold, or distributed HCPs in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts,

as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(c)     The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq*., including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, et seq., of the California Business and Professions Code, set forth above;

(d)     Defendants' acts, omissions, misrepresentations, practices, an non-disclosures, as described above, whether or not in violation of Section 16720, *et seq*., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(e)     Defendants' acts or practices are unfair to consumers of  HCPs (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(f)     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(g)     Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(h)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(i)     The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for HCPs (or vehicles containing them).  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(j)     The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

230.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which HCPs were sold, distributed or obtained in the District of Columbia.

(b)     The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.  Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for HCPs.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing HCPs because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges. Defendants' conduct with regard to sales of HCPs, including their illegal conspiracy to secretly fix the price of HCPs at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.  The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for HCPs.

(c)     Defendants' unlawful conduct had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) HCP prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(d)     As a direct and proximate result of the Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

71

Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

231. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

(a) Defendants' unlawful conduct had the following effects: (1) HCP price competition was restrained, suppressed, and eliminated throughout Florida; (2) HCP prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b) During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

232. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

(a)     Defendants' unlawful conduct had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) HCP prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

233.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

(a)     Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

(b)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which HCPs were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(c)     Defendants' unlawful conduct had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) HCP prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

(e)     Certain of the Defendants have been served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the Defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.  More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

(f)     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

234.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

(a)      Missouri Plaintiff and members of this Damages Class purchased HCPs for personal, family, or household purposes.

(b)      Defendants engaged in the conduct described herein in connection with the sale of HCPs in trade or commerce in a market that includes Missouri.

(c)      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which HCPs were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

(d)      Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for HCPs.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of HCPs they purchased.

(e)      Defendants misrepresented the real cause of price increases and/or the absence of price reductions in HCPs by making public statements that were not in accord with the facts.

(f)      Defendants' statements and conduct concerning the price of HCPs were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing HCPs at prices established by a free and fair market.

(g)      Defendants' unlawful conduct had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Missouri; (2) HCP prices

75

were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3)

Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

prices for HCPs.

(h)     The foregoing acts and practices constituted unlawful practices in

violation of the Missouri Merchandising Practices Act.

(i)     As a direct and proximate result of the above-described unlawful

practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or

property.

(j)     Accordingly, Plaintiffs and members of the Damages Class seek all

relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. §

407.020, which prohibits "the act, use or employment by any person of any deception, fraud,

false pretense, false promise, misrepresentation, unfair practice or the concealment,

suppression, or omission of any material fact in connection with the sale or advertisement of

any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State

Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et*

*seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

235.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer

Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*

(a)     Defendants' unlawful conduct had the following effects:  (1) HCP price

competition was restrained, suppressed, and eliminated throughout Montana; (2) HCP prices

were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3)

Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(b)     During the Class Period, Defendants marketed, sold, or distributed HCPs in Montana, and defendants' illegal conduct substantially affected Montana commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

236.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which HCPs were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for HCPs as set forth in N.M.S.A.,

77

§ 57-12-2E.  Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for HCPs.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing HCPs because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs' could avoid the overcharges.  Defendants' conduct with regard to sales of HCPs, including their illegal conspiracy to secretly fix the price of HCPs at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.  The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for HCPs.

(c)     Defendants' unlawful conduct had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) HCP prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(d)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

237.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*.

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which HCPs were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants and their co-conspirators made public statements about the prices of HCPs and products containing HCPs that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for HCPs and products containing HCPs; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

(c)     Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased HCPs were misled to believe that they were paying a fair price for HCPs or the price increases for HCPs were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

(d)     Defendants knew that their unlawful trade practices with respect to pricing HCPs would have an impact on New York consumers and not just the Defendants' direct customers.

(e)     Defendants knew that their unlawful trade practices with respect to pricing HCPs would have a broad impact, causing consumer class members who indirectly purchased HCPs to be injured by paying more for HCPs than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(f)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York in an honest marketplace in which economic activity is conducted in a competitive manner.

(g)     Defendants' unlawful conduct had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout New York; (2) HCP prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for HCPs.

(h)     During the Class Period, Defendants marketed, sold, or distributed HCPs in New York, and defendants' illegal conduct substantially affected New York commerce and consumers.

(i)      During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed HCPs in New York.

(j)      Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

238.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which HCPs were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases.  Defendants' public statements concerning the price of HCPs created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy.  Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of higher-level officials at each company and avoiding the creation of documents which would reveal the antitrust violations.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Defendants' unlawful conduct had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) HCP prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(e)     During the Class Period, Defendants marketed, sold, or distributed HCPs in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(f)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed HCPs in North Carolina.

(g)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

239.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

(a)    Members of this Damages Class purchased HCPs for personal, family, or household purposes.

(b)    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HCPs were sold, distributed, or obtained in Rhode Island.

(c)    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for HCPs. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants' HCPs prices were competitive and fair.

(d)    Defendants' unlawful conduct had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) HCP prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(e)    As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or

property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(f) Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of HCPs, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing HCPs at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of HCPs they purchased.

(g) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

240. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a) Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HCPs were sold, distributed, or obtained in Vermont.

(b) Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for HCPs. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that

duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants' HCPs prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects:  (1) HCP price competition was restrained, suppressed, and eliminated throughout Vermont; (2) HCP prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for HCPs.

(d)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of HCPs, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing HCPs at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf Of Plaintiffs And The Damages Class)

241.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

242.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of HCPs.

243.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs of the members of the Damages Class for HCPs.

244.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)    A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.     Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.       Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

DATED:  February 28, 2013                    **COTCHETT, PITRE & McCARTHY, LLP**


By _____*/s/ Joseph W. Cotchett*_____

Joseph W. Cotchett
Frank C. Damrell
Steven N. Williams
Adam J. Zapala
Elizabeth Tran
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
jcotchett@cpmlegal.com
fdamrell@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
etran@cpmlegal.com

Hollis Salzman
Bernard Persky
William V. Reiss
**ROBINS, KAPLAN, MILLER & CIRESI,
LLP.**
601 Lexington Avenue, Ste. 3400
New York, NY 10022-4611
Telephone:   (212) 980-7400
Facsimile:   (212) 980-7499
hsalzman@rkmc.com
bpersky@rkmc.com
wreiss@rkmc.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

89

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone: (214) 754-1900
Facsimile: (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

*Attorneys for Plaintiffs and Interim Co-Lead
Class Counsel for the Proposed End-Payor
Plaintiffs Classes*

E. Powell Miller (P39487)
Adam T. Schnatz (P72049)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ats@millerlawpc.com

*Attorneys for Plaintiffs and Interim Liaison
Counsel for the Proposed End-Payor Plaintiffs
Classes*

90

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  February 28, 2013            **COTCHETT, PITRE & McCARTHY, LLP**


By:_____*/s/ Joseph W. Cotchett*_____

Joseph W. Cotchett
Frank C. Damrell
Steven N. Williams
Adam J. Zapala
Elizabeth Tran
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
jcotchett@cpmlegal.com
fdamrell@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
etran@cpmlegal.com

Hollis Salzman
Bernard Persky
William V. Reiss
**ROBINS, KAPLAN, MILLER & CIRESI, LLP.**
601 Lexington Avenue, Ste. 3400
New York, NY 10022-4611
Telephone:   (212) 980-7400
Facsimile:   (212) 980-7499
hsalzman@rkmc.com
bpersky@rkmc.com
wreiss@rkmc.com

91

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone:  (214) 754-1900
Facsimile:  (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

*Attorneys for Plaintiffs and Interim Co-Lead*
*Class Counsel for  the Proposed End-Payor*
*Plaintiffs Classes*

E. Powell Miller (P39487)
Adam Schnatz ((P72049)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com
ats@millerlawpc.com

*Attorneys for Plaintiffs and Interim Liaison*
*Counsel for the Proposed End-Payor Plaintiffs*
*Classes*

92